|102 31|
|f110 26|

|102 31|
|113 597|

THE NORWEGIAN PLOW COMPANY v. W. C. CLARK, Sheriff, Appellant.

**Sale or Bailment.** A contract between a manufacturer of goods and another person, giving the latter the privilege of selling goods in a certain territory and requiring him to obtain settlement for all goods at the time of delivery, either in cash or notes to be made payable to the manufacturer, and requiring him to turn over all cash and notes received by him to such manufacturer, and not permitting him to use any of the proceeds of sales until the manufacturer is paid in full, and authorizing him to sell goods at a reasonable profit and subject to a specified warranty, and in addition, requiring him to guarantee the sales of all goods shipped to him on his order by a time specified therein, and insure the fulfillment of the contract, and requiring him in order to fulfill the contract to advance, at the time of shipment, one-third of the agreed price thereof in cash, and to execute his notes for the balance, and providing for the giving a credit on his account at the end of the season for goods remaining on hand and accepted by the manufacturer, is a contract of sale, and not of bailment, and notes received by him as payee for goods sold by him are subject to levy for his debts, although the manufacturer has not been paid.

*Appeal from Cerro Gordo District Court.*—HON. PORTER W. BURR, Judge.

SATURDAY, APRIL 10, 1897.

ACTION at law to recover the possession of seven promissory notes signed by various parties, and made payable to one John Bush. It is claimed that Bush took the notes as agent for the plaintiff, in the sale of agricultural implements. The defendant says he is entitled to the notes by virtue of the levy of an execution thereon as the property of John Bush; that the notes were in fact the property of Bush, or, if not his property, that he held title thereto under a conditional contract, which was not recorded, and of which neither he nor the execution plaintiff had notice or knowledge

at the time of the levy. Defendant further claims that the alleged agency of Bush is and was a mere pretense, and had existence only for the purpose of defeating and defrauding the creditors of Bush. On these issues the case was tried to the court, without a jury, resulting in a judgment for plaintiff and defendant appeals.—*Reversed.*

*Blythe, Markley & Smith* for appellant.

*Richard Wilber* for appellee.

DEEMER, J.—Appellee is a wholesale dealer in farm machinery at the city of Dubuque; and, at the time of the happening of the matters in controversy, Bush was a retail dealer in the same line of goods at Mason City. Bush had been buying goods of the appellee, in the regular way, for some fifteen years prior to 1893. In this last-named year he became insolvent, and a new arrangement was made between the parties, by written contract, to which reference will hereafter be made. The notes in controversy were taken by Bush during the year 1894. No written contract was made for that year, but the understanding was (to quote the language of appellee's agent), "that the same deal we had in 1893 should prevail in 1894." Bush also says that this was the arrangement. The written contract consists of two parts, the material parts of which are as follows: It first recites that appellee gives Bush the privilege of selling goods to the trade tributary to Mason City, and Bush agrees to do all the business pertaining to the sale of the goods, pay freight and charges against them, keep the same insured, pay taxes, keep them well housed and in good order, free of charge, and until sold or disposed of by order of first party. The next provision is an agreement on the

part of Bush to sell the appellee's goods exclusively, at a reasonable profit, and with an authorized warranty, making purchasers' obligations mature not later than December 1 of the year of sale. This is followed by a provision that Bush is to obtain settlement for all goods at time of delivery to purchasers, either by cash or notes, all notes to be payable to appellee, and to be secured so as to make them bankable; and, at any settlement between the parties, Bush was to furnish to appellee a full account of sales, and to turn over to appellee all cash, notes, or other proceeds of sale. Bush was not to retain or use any of the proceeds of the sales until appellee was paid in full. This is followed by a provision whereby Bush guaranteed the sale of all goods shipped him on his order under the contract, by the time specified in the annexed order, and, to insure the fulfillment of the contract, he further agreed to advance, at the time of such shipments, one-third the agreed price thereof in cash, and to execute his notes for the balance, or at his option, as an evidence of the indebtedness and of the price agreed upon, to execute his notes for the full value of the goods on the terms provided in an attached price list. And all the proceeds of sales and collections of purchasers' notes, less expense of collecting the same, were to be applied in payment of the unpaid balance of Bush's notes and accounts. It was further provided that Bush might take up his notes at any time by cash or farmers' notes taken for goods sold, and on such terms as the parties might agree upon, and with a guaranty thereafter provided. Bush also guaranteed the collection of all purchasers' notes and all renewals thereof, and a form of guaranty waiving demand is embodied in the contract. It was further agreed that appellee should have at all times the entire and exclusive control of all accounts, contracts, and other property accruing out of the sale of

the goods. Bush further agreed to hold all goods
remaining on hand at the end of the season free of
charge, but, if appellee should order their delivery,
then Bush was to place same on board cars, and was
entitled to a credit for their value upon his account.
A further provision was to the effect that the goods
should be held by Bush on special storage, and
deposited as the property of appellee until converted
into money or notes, as by the contract provided; and
when so converted, the money and notes were to be
held on special deposit for appellee, as collat-
eral security to any indebtedness of Bush,
either on notes given by him or guaranteed
under the terms of the contract, and surrendered on
order of appellee. A further condition was to the
effect that Bush was to settle for all goods at such
prices and on such terms as were stipulated in the
order attached, which order was made a part of the
contract, and all orders for goods were made subject
to the approval of appellee. The order attached to
this contract, and made a part of it by express refer-
ence, was in effect a request of appellee to manufac-
ture and ship to Bush certain goods, for which he
agreed, on shipment or demand, to give notes, payable
at dates, and on conditions stated therein. Notes given
for plows and other goods for spring trade were to
mature July 1, and those given for goods sold for fall
trade were to become due November 15. This pro-
vision was followed by a statement of certain discounts
allowed for cash. By the next paragraph, Bush was to
receive and keep the goods well stored and insured; and
recapitulated certain other collateral agreements con-
tained in the first paper, and further says that all
goods on hand and the proceeds of sale of goods
shipped shall be held for the exclusive use and benefit of
appellee for their security until all Bush's obligation
arising under the contract were completely fulfilled. It

was also agreed that all future orders should be sub-
ject to the terms and prices contained in the order,
unless otherwise expressly agreed in writing. Appellee
agreed to pay all expenses of collecting the notes. This
order also contained these provisions: "No consign-
ments made. No goods carried in the hands of customers.
Consignees must look to carriers for all loss or damage
to goods where same are shipped and receipted for in .
good order." This was followed by a long price list of
the different kinds of goods manufactured by appellee.
The contract proper was signed by both parties, and
the order by Bush alone. Bush ordered many goods
during the years 1893 and 1894, and in each instance an
invoice was sent him, showing an ordinary sale of the
goods. During the year 1894, and after appellee had
shipped many goods to Bush on orders similar to the
one quoted, it wrote him many letters, and from them
we extract the following statements: "Your favor of
* * * draft for $60.06 received, for which please
accept thanks." "We have a good deal of money to
raise Monday. Rush all you can. Send here by Mon-
day morning. We will allow you 5 per cent disc."
"Received from John Bush the following notes, to be
held as collateral to his account." "Received of John
Bush the above-named notes, to be held by us, and
any payments on same to be credited to his account.
When settlement is complete, any notes remaining in
our hands to be returned to John Bush." In Novem-
ber, 1893, appellee rendered a statement to Bush,
showing total charges and credits. Among the credits
was this item: "Farmers' notes as collateral, $437.50."
This account also showed a balance due from Bush of
two hundred and sixty-two dollars and fifty cents.
The oral testimony shows that Bush gave no notes for
the goods shipped him under the contract above set
out, and that he paid appellee for the goods as they
were sold by him, and that the invoices to which we

have referred were upon the common form used by the company, whether they sold the goods direct, or shipped them on what are denominated "agency contracts." Appellee's agent, who made the contract, also testified that they made such instruments as the one referred to as security, and that they did not make them with people who were considered good.

This, in substance, is all the evidence upon which the case was decided, and appellant insists that the court erred in construing the contract to be one of bailment, and not of sale. This presents the principal question in the case, and to this claim we now turn our attention. It may be that the parties intended this to be a contract of agency, and not of sale; but their agreements, whatever the intention, were merged in the written instruments to which we have referred, and their respective rights and liabilities must be determined by reference to this contract, construed in the light of the surrounding circumstances. Appellant says that the rule by which to determine whether a contract is one of bailment or sale is this: "That if the identical thing is to be returned, even in an altered form, it is a bailment; but if the receiver is at liberty to return another thing, whether in the same or a different form, or to pay money at his option, it is a sale." This is the rule sometimes given in the books. *Vide* Brown, Bailm., p. 3; Benjamin, Sales (6th Ed.), p. 5; *Wright v. Barnard*, 89 Iowa, 166 (56 N. W. Rep. 424). And the supreme court of Illinois adopted this test in a case quite like the one at bar. See *Chickering v. Bastress*, 130 Ill. 206 (22 N. E. Rep. 542). Now, while this test is no doubt a good one in a certain class of cases, yet it is by no means certain in a case of this character. If this were the rule, it would do away with all that kind of bailments known as "consignments for sale," because there is no obligation in such a case to return the specific article, but

only the value thereof in money after a sale is made
by the factor or consignee; or, in case no sale is made,
then to restore the specific article.   To arrive at a
proper solution of the question, we must determine
whether this contract created a mere bailment for the
purpose of sale; or a sale on time; or with reservation
of title until paid for, and therefore void, under our
recording act (section 1922 of Code of 1873).   If the
contract is one of pure agency, providing for a con-
signment of goods to be paid for at a fixed price out
of the proceeds of the goods when sold, then it is a bail-
ment for sale, and the title remained in the appellee
until the goods were sold to a *bona fide* purchaser for
value.   But if the contract is in form an agency con-
tract, but really one of sale, made so for the purpose
of evading the statute; or if it is in reality a contract
of sale by which the consignee became in fact a pur-
chaser, and was liable for the goods when sold, as the
principal debtor, then the contract is one of sale.
Benjamin, Sales (6th Ed.), p. 7; 3 Am. & Eng. Enc. Law,
340.   One of the principal tests by which to determine
this question is, was there a binding promise on the
part of the consignee to pay for the goods?   If there
was such promise, the contract is ordinarily held to be
one of sale, and not of bailment.   *Bentley v. Snyder*,
101 Iowa, 1 (69 N. W. Rep. 1023.)

Great difficulty arises in applying these rules, and,
as a consequence, there are numerous and conflicting
decisions upon the subject.   We will not undertake to
review any considerable number of them, but will con-
tent ourselves with an effort to apply the principles
above announced to the facts disclosed by this record.
The contract, instead of being plain and simple, is long,
indefinite, and somewhat obscure.   It gives Bush the
privilege of selling appellee's goods in a certain terri-
tory, provides that he shall obtain settlement for all
goods at time of delivery, either in cash or notes (notes

to be payable to appellee), and that he shall turn over all cash and notes received by him to appellee. None of the proceeds of sales could rightfully be used by Bush until appellee was paid in full. Appellee was to have full control of accounts, contracts, etc., accruing out of sales, and goods were to remain the property of appellee until converted into money or notes, as provided by the contract; and the money and notes taken for the goods were to be held on special deposit by appellee as collateral security to any indebtedness of Bush, either on notes given or guarantied by him. Bush was to sell the goods at a reasonable profit, and subject to an authorized warranty, and make all purchasers' payments for the same due, not later than December 1 of the year of sale. Thus far the contract is purely one of consignment for sale. But, in addition to these provisions, we find that Bush guarantied the sale of all goods shipped him on his order by the time therein specified, and, to insure the fulfillment of this contract, agreed to advance, at the time of shipment, one-third of the agreed price thereof in cash, and to execute his notes for the balance, or at his option, as an evidence of the indebtedness and of the price agreed upon, to execute his notes for the full value thereof, on terms provided in the order and price list before referred to. It is true that all proceeds of sale and collections of purchasers' notes, less expenses of collection, were to be applied in payment of unpaid balance due upon the notes or unsettled accounts of Bush; but it was also provided that Bush might take up any of his notes, either by cash or by notes taken for machinery sold; but the taking of the notes in lieu of cash was to be upon such terms as might be agreed upon, and not as of right, and then only with an absolute guaranty on the part of Bush. The machinery remaining on hand at the end of the season, and accepted by appellee,

was to be credited on Bush's account. The money and notes taken by Bush were to be held on special deposit as collateral security for appellee to any indebtedness of Bush on either the original or guarantied notes. Bush further agreed to settle for all goods at such prices and on such terms as are stipulated in the order which was made a part of the contract. In the order for the goods, Bush agreed to give his notes, payable at the dates and on the conditions therein stated; and this order further stated that the proceeds of all goods shipped should be held for the exclusive use and benefit of appellee as security, until all of Bush's obligations arising under the contract were fully complied with. Another condition of the order was the following: "No consignments made. No goods carried in the hands of customers. Consignee must look to carriers for all loss or damage to goods." Was there a promise on the part of Bush to pay for the goods shipped? It seems very clear to us that there was. It is true that this promise might be fulfilled by turning over cash or notes taken for machinery sold by him. But mutual agreement of the parties was necessary to a liquidation of Bush's obligations by these farmers' notes. The purchase price of the machinery was all charged to Bush; and it appears that if any remained at the end of the season, which appellee elected to receive back, Bush was to have credit for the invoice price thereof. The primary indebtedness was that of Bush, for the contract expressly says that the cash and notes received by him from sales of the goods were to be held as collateral security to his indebtedness to the company. Corroborative of this is the statement in the order that appellee made no consignments, carried no goods in the hands of customers, and that consignees should look to carriers for all losses or damage to goods. Again, the order says, "no goods to be returned without our order."

By the terms of the contract, Bush had the right to sell the goods at his own price, provided a reasonable profit was realized, and to appropriate any of the money or notes received by him for the goods after he had paid his obligations to the appellee. The only rational conclusion to be drawn from these provisions, it seems to us, is, that Bush purchased the goods upon credit, upon condition that he would devote the entire proceeds of all sales to the payment of the indebtedness created by the purchase. The invoices used by the appellee point strongly in this direction; and the further fact that appellee recognized Bush as its debtor, in all its correspondence subsequent to the making of the contract, is almost conclusive of the subject. The mere fact that the parties called the payment, by the execution of the notes required of Bush, an advance, is not of controlling importance. This term was evidently used to disguise the real transaction. Divested of all superfluities, the contract required Bush to become a purchaser of such goods as he might order, and the fact that it contains other undertakings, does not change its character.

One clause of this contract is almost identical with that construed in the case of *Plow Co. v. Braden*, 71 Iowa, 141 (32 N. W. Rep. 247). We held the contract in that case to be one of conditional sale, and not a bailment. See, also, *Wright v, Barnard, supra*; *Chickering v. Bastress*, 130 Ill. 206 (22 N. E. Rep. 542); *Machine Co. v. Holcomb*, 40 Iowa, 33; *Manufacturing Co. v. Johnson*, 97 Mich. 31 (56 N. W. Rep. 932); *Mack v. Tobacco Co.* (Neb.) 67 N. W. Rep. 174; *Kellam v. Brown*, 112 N. C. 451 (17 S. E. Rep. 416); *Manufacturing Co. v. Lyons*, 153 Ill. 427 (38 N. E. Rep. 661). Appellee relies upon the cases of *Budlong v. Cottrell*, 64 Iowa, 234 (20 N. W. Rep. 166); *Conable v. Lynch*, 45 Iowa, 84, and *Bayliss v. Davis*, 47 Iowa, 340. The first

case is clearly not in point. The theory of the court in construing the contract in that case was that it was to be fully executed by the parties at substantially one time, and that, until fully executed, neither the title to the property nor any right or interest therein passed to the consignee. Neither is the *Conable Case* authority for a doctrine contrary to that here announced. The controlling thought in that case was that the consignee should continue to sell the machines and property until August 1, 1875, as the agent of the plaintiff, and any that remained unsold at that date he was to take and pay for in notes or other valuable consideration. The consignee delivered some of the goods to a stranger in payment of his own debt before the first of August, and, in a contest between the consignor and the creditor, it was held that the consignor was entitled to recover, for the plain reason that at the time of the sale Berry was acting as agent for the consignor, and could not dispose of the property in payment of his own debts. The *Bayliss Case* is more nearly in point, but in that case the fact that the consignee advanced one-third of the value of the goods to the consignor, and gave his note for the balance, was not regarded as controlling, for the reason that he was to be repaid the advances from cash payments made by farmers to whom he might sell machines, and his notes were to be taken up and canceled by farmers' notes taken by him. It further appears that these farmers' notes were held at all times by the consignee as agent for his principal, and not as collateral security to an indebtedness owing by him to the consignor. The evidence adduced upon the trial was not before us in that case, and the decision was based solely upon the written contract. There are these further differences between that case and the one at bar: Thomas Stinson was expressly appointed agent, and his commission for the sale of machines was fixed. He was

to remit proceeds of sales as fast as received, "after deducting advances specified in contract;" and the notes given by him were to be taken up by exchanging "therefor farmers' notes taken for said machinery." In this case Bush's commission was not fixed. He was not required to remit proceeds of sales as fast as received, nor was he authorized to withhold cash to meet the advances made by him, nor could he as a matter of right, exchange farmers' notes for his own. He held the notes and cash received on special deposit for the appellee as collateral security to his indebtedness to the company on his notes. In one case the consignee had the absolute right to exchange farmers' notes for his own, and to pay his obligations (if such they may be called) from this particular fund. Moreover, this fund belonged at all times to the consignor In the other he had no such right, and he held the fund as collateral security to the main indebtedness of the consignee for the goods. He did not have the right of exchange, and it was optional with the consignor as to whether it would accept farmers' notes in liquidation of the principal obligation. The consignee could not insist upon the payment of his obligation from the particular fund, and he was at liberty to pay his indebtedness at any time after it was due, and retain the money and notes received by him from sales of machinery. The cases are clearly distinguishable, and the case at bar is more nearly like that of *Plow Co. v. Braden, supra,* than any that have heretofore been decided in this court. Appellee says that the orders made by Bush should not be considered in construing the contract. To this proposition we cannot agree. The papers were made at the same time, and evidently as a part of one transaction. Moreover, each of the papers specifically refers to the other; and in the contract it is expressly provided that the order is a part thereof,

It is further suggested in argument, that as Bush made no advance payments upon the machinery, and did not give the notes called for by the contract, he should not be held to be a purchaser. To this, it may be said, that if he received the goods under the contract, he became the purchaser thereof, and the mere failure of the company to exact compliance with the contract by Bush, would not change the nature of the transaction. *Warder, Mitchell & Co. v. Hoover & Co.*, 51 Iowa, 491 (1 N. W. Rep. 795). The evidence affirmatively shows, that appellee regarded Bush as its debtor for the goods, for it sent him statements of account, in which it charged him with the machines, and credited him with cash, and with certain notes received, and also made mention that it held certain of them as collateral security to his account. If the contract is to be wholly disregarded, then it is clear, from the evidence adduced, that appellee is not entitled to recover. Bush said on the witness stand, that when he received goods from appellee, he knew the prices he was to pay for them, and that, when he sold them, he paid appellee a certain price agreed upon beforehand. If this be true, then the title passed as soon as he sold the goods to a purchaser, and the company held his obligation to pay for them at certain fixed prices. The notes attached in this case were for goods sold, and it is certain that the title to the goods passed to the purchaser. Bush was obligated to pay appellee for the goods so sold, at certain fixed prices, and might hold the notes as his own; or, to give the case the brightest aspect for appellee, Bush held the notes as collateral security for appellee to secure his indebtedness. If it be said appellee is entitled to the notes because of a lien thereon in virtue of the clause of the contract providing that they should be held as collateral to Bush's indebtedness, a ready answer is, that appellee alleged in its

petition, that it was the absolute and unqualified owner of the notes, and that Bush held them simply as agent. It could not recover on such a petition by evidence tending to show a qualified interest. *Kern v. Wilson*, 73 Iowa, 490 (35 N. W. Rep. 594); *Woolsey v. Williams*, 34 Iowa, 413.

Appellee insists that, as the case was tried to the court below as an action at law, we cannot interfere with its finding on questions of fact. Ordinarily this is true. But the construction of the contract was a question of law for the court, reviewable upon error; and not of fact, where all presumptions are in favor of the result reached. The contract is, it seems to us, one of sale, and not of bailment, although there is much language tending to show a "consignment for sale." But taking the instrument as a whole, and reading it in the light of the interpretation put upon it by the parties themselves, we think it ·clearly contemplates a delivery of the goods to the consignee, with a promise on his part to pay for them at certain fixed prices from any funds which he might see fit to use for that purpose.

It is unnecessary, in view of the conclusions reached, to pass upon appellant's claim of fraud in the transaction, although we may observe in passing that the obscurity of the language used may be attributed to a desire to mystify and perplex, so that appellee might call it a contract of agency or sale, as the circumstances seemed to demand.

Appellee appeals from an order of the court taxing certain costs to it. A decision of this question is uncalled for, in view of the conclusion reached in the former part of this opinion. For error in construing the contract, the judgment of the lower court is REVERSED.