## In re HECKATHORN.

(District Court, W. D. Pennsylvania. March 17, 1906.)

### No. 3,029.

1. BANKRUPTCY—RECOVERY · OF GOODS—CONTRACT—SALE OR BAILMENT—WHAT LAW GOVERNS.

In a proceeding against a bankrupt's trustee to recover certain goods alleged to have been bailed and not sold to the bankrupt, whether the contract constituted a bailment or a sale is governed by the local law.

2. SAME—BURDEN OF PROOF.

Where goods sought to be recovered from the bankrupt's possession and accounts claimed by the petitioners for goods sold by the bankrupt were standing on the bankrupt's books in his name, both the goods and the accounts were presumptively his, and the burden was on petitioners to show title thereto.

3. SALES—SALE DISTINGUISHED FROM BAILMENT—CONTRACT—CONSTRUCTION.

Goods were billed by petitioners to a bankrupt at definite prices and on fixed terms of credit and discount; the bankrupt undertaking to settle or pay for them and to be responsible for the freight. He also agreed to give petitioners his exclusive trade and to render accounts for goods sold every six months. He was also required to hold separate and in trust all "goods unsold and all currency, open accounts, notes, liens, mortgages, or other values received for goods sold," and that, where goods were sold on credit, notes should be taken on blanks furnished by petitioners and made payable to their order, the bankrupt indorsing and guarantying them. Held, that the trust provision of the contract related merely to the manner of payment for the goods, and that the contract was one of sale, and not of bailment.

In Bankruptcy. On exceptions to the report of a referee on petition of the American Agricultural Chemical Company for the reclamation of certain property delivered to the bankrupt under the following contract:

W. Pa., Pan Handle, W. Va., Yearly Contract, 1906.

The American Agricultural Chemical Company.

Buffalo Sales Department, Dec. 30, 1904.

To J. A. Heckathorn. P. O.: McCaslin. County: Lawrence. R. R. Sta.: East Brook. County: Lawrence. State of Pa.

We hereby agree to ship you, under the conditions and stipulations hereinafter named, the following fertilizers at prices and terms named below:

The terms and conditions of this contract are as follows, and the prices named below are net to us:

| Brands. Freight Prepaid. | Ammo. | Avail P. A. | Potash. | Price per 2,000 lbs. in 167 or 200 lb. bags at your R. R. Station in C. L. lots. |
|---|---|---|---|---|
| Standard Disolved Bone Phs. | | 14 | | $12 40 |
| "       Bone & Potash | | 10 | 2 | 13 40 |
| "       A. Fertilizer | 1 | 7 | 1 | 16 15 |
| "       Guano | 1¼ | 8 | 2 | 18 00 |
| "       Fine Ground Bone | 3 | 20 | | 24 00 |
| Special Potash Mixture | 1 | 9 | 7 | 22 00 |
| Md. Special Compound Potash | 2 | 8 | 10 | 27 25 |

If in less than car load lots, excess freight to be added. If ordered in 100 pound bags, 50 cents per ton additional.

We have the right to change the above prices for the fall trade by giving notice thereof on or before June 1st, 1905.

You agree to pay freight on all shipments and send us your paid freight bills, which we will pass to the credit of your account.

Full settlement for spring shipments shall be made by you not later than July 1st, 1905, in cash or by notes (given by purchasers of these goods) received and endorsed by you. If settlement is made in cash at above date, we will allow you a discount of five per cent (5%) from the face of the invoices. For all cash received prior to July 1st, 1905, we will allow you an additional discount from the face of the invoices at the rate of six per cent. (6%) per annum from the date of such prepayment to July 1st, 1905. For all cash received after July 1st, and prior to December 1st, 1905, we will allow you a discount at the rate of one per cent (1%), per month, to December 1st, 1905.

Full settlement for fall shipments, including goods on hand at the end of this season, shall be made by you not later than December 1st, 1905, in cash or notes (given by purchasers of these goods) received and endorsed by you. If settlement is made in cash at above date, we will allow you a discount of five per cent. (5%) from the face of the invoices. For all cash received prior to December 1st, 1905, we will allow you an additional discount from the face of invoices, at the rate of six per cent. (6%) per annum from the date of such prepayment to December 1st, 1905.

For conditions of settlement, see reverse side of contract. This contract, written and printed, constitutes the entire agreement and no verbal understanding will be recognized. The above-named provisions of this contract, as well as those on the reverse side of this agreement, which are, and are to be considered as a part of this contract, shall not be in force until accepted by the Home Office.

Signed in triplicate, this 30th day of December, 1904.

The American Agricultural Chemical Company.

Standard Fertilizing Works.

D. M. Caplin, Salesman.

Accepted on conditions named and I agree to give you my exclusive Fertilizer trade.

[Name]   J. A. Heckathorn.

The following terms and conditions are and are to be considered as a part of the terms and conditions stated upon the opposite side of this contract form:

You agree to render us an account of goods on July 1st, also on December 1st, 1906.

It is agreed that you will hold in trust and separate, for the settlement of our account with you, all of said goods unsold and all currency, open accounts, notes, liens, mortgages or other values received for all goods sold.

This contract is subject to suspension in case of fire, accident to our works, or other causes.

We have the right to ship said goods or any part thereof, from any factory.

We reserve the right to cancel this contract at any time we deem proper, but in event of such cancellation, the provisions of this contract shall govern the closing of all business begun thereunder. If settlement is made in purchasers' notes, said notes shall be made out on blanks furnished by us, payable to our order at some bank. If for spring settlement, to be dated not later than July 1st, and mature not later than December 1st, 1905, without interest. If for fall settlement, to bear interest at the rate of six per cent. (6%) per annum, from a date not later than December 1st, 1905, and mature not later than October 1st, 1906. You agree to endorse such notes and guarantee payment of the same thereon at maturity, with interest, and you also agree to waive protest, demand and notice of non-payment and all right to require the holders of said notes, by written or other notice, to commence action against the makers of said notes if a right of action accrue thereon. You also agree to waive all homestead exemptions as to any obligations under this contract.

If we request it, you agree to give your own note, payable in bank, with the express understanding that said note is to be received by us as evidence of sales and in confirmation of your guaranty as above stated and not as payment; and notwithstanding the reception of said note, all accounts, and notes, and moneys received for goods are to remain our property, but your said note shall be enforceable to the extent of all losses suffered by us on all sales made and guaranteed by you.

A. W. Gardner, for petitioners.
Wylie McCaslin, for trustee.

ARCHBALD, District Judge.[1] As in so many cases which come up where dealings are had with a person of limited means and meager credit, the transaction here has the appearance on its face of seeking to have the advantage of a sale and at the same time retaining the security of a bailment. This is a difficult thing to do, and we need not be surprised if the petitioners have not been more successful than have others. Claim is made in these proceedings to certain fertilizers shipped to the bankrupt, which he had on hand at the time of his bankruptcy, amounting to $48.78; and also to certain accounts with customers to whom he had made sales, amounting to $88.80 more.

As the basis of this claim, it is contended that the bankrupt was a factor or agent merely, selling these fertilizers for and account of the petitioners, from whom they were received, and to whom, as it is said, they belonged, justifying their present assertion of title. There is no evidence of the relation of the parties other than the written contract between them, and the case turns, therefore, on the proper construction to be given to it.

[1] Specially assigned.

This is a Pennsylvania transaction and is governed by the local law. Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986. The goods, being in the possession of the bankrupt, and the accounts on his books, standing in his name, are both presumptively his, and the burden is on the petitioners to show otherwise; any doubts upon this subject being resolved against them. In re Murphy Barbee Shoe Co., 11 Am. Bankr. R. 428; In re Tice (D. C.) 139 Fed. 52; In re Wood (D. C.) 140 Fed. 964. The trustee in any such controversy is invested with the rights of creditors. In re Butterwick (D. C.) 131 Fed. 371; Tams v. Bullit, 35 Pa. 308; Duplex Printing Press Co. v. Clipper Publishing Co., 213 Pa. 207, 62 Atl. 841; English v. Ross (D. C.) 140 Fed. 630. He is not limited like an assignee under the state law, who is merely a representative of the debtor. Wright v. Wigton, 84 Pa. 163. Keeping this in mind, and looking to the writing, in accordance with which the goods were delivered, we find that they were billed to the bankrupt at definite prices, and upon fixed terms of credit and discount; the bankrupt on his part undertaking to settle or pay for them and to be responsible for the freight. These are the ordinary marks of a sale, and not of an agency, which there is nothing in the other provisions of the contract to directly suggest. It is only indirectly and by implication that it is sought to be made out. It is pointed out for instance that the bankrupt was to give to the petitioners his exclusive trade; that accounts of goods sold were to be rendered every six months on July 1st and December 1st; that he was required to hold separate and in trust all "goods unsold, and all currency, open accounts, notes, liens, mortgages, or other values, received for goods sold"; and that, where they were sold on credit, notes were to be taken on blanks furnished by the petitioners, and made payable to their order, the bankrupt indorsing and guarantying them.

But, while this may steer close to the line, it does not necessarily make out a case of principal and agent such as is contended for. It is the rather suggestive of an attempt, as is said above, to have the benefit of a sale without the responsibility for it, disposing of the goods at a price and at the same time retaining a hold upon them and upon the proceeds derived from their sale. But why this beating about the bush when a direct course was open to them? If the intention was that the bankrupt should receive and sell the goods, for and on account of the petitioners, upon a commission, it would have been easy, in so many words, to say so; and the failure to do it can but be regarded as significant. There was no difficulty, if that was what was sought to be provided for, in having the bankrupt responsible for the solvency of purchasers and the collection of the accounts against them, without affecting the relation; this being accomplished by means of a del credere engagement, familiar to all. 19 Cyc. 152. It was also possible to arrange that the bankrupt should look for his commissions as factor to all over and above a certain sum, accounting only for that amount. McCullough v. Porter, 4 Watts & S. 177, 39 Am. Dec. 68; Keystone Watch Co. v. National Bank, 194 Pa. 535, 45 Atl. 328. But, without providing for anything of that kind, the contract was drawn with all its pecularities in its present form.

Taking into consideration what might have been provided in the directions suggested, and having regard to the general effect of the writing, it is difficult to escape the conclusion that a sale was not only intended, but was as a matter of law brought about, which the particular provisions which are relied upon are not sufficient to qualify. These go merely to the matter and manner of payment, after all, for which the bankrupt under all circumstances is made liable, subject to which the goods from the outstart are his. In re Tice (D. C.) 139 Fed. 52; In re Poore, Id. 862.

The report of the referee is confirmed, and the petition is dismissed, with costs.