**QUALITY EGG SHIPPERS, Inc.**

v.

**UNITED STATES.**

**GROSS**

v.

**UNITED STATES.**

Nos. 14892, 14893.

United States Court of Appeals,
Eighth Circuit.

April 23, 1954.

**418**

Wiley E. Mayne, Sioux City, Iowa (Jesse E. Marshall, Sioux City, Iowa, Irving M. Wolff, Miami, Fla., on the brief; Shull & Marshall, Sioux City, Iowa, of counsel), for appellants.

F. E. Van Alstine, U. S. Atty., Sioux City, Iowa (Richard W. Beebe, Asst. U. S. Atty., Sioux City, Iowa, on the brief), for appellee.

Before GARDNER, Chief Judge, and JOHNSEN and COLLET, Circuit Judges.

COLLET, Circuit Judge.

Quality Egg Shippers, a corporation, and Herman Gross were convicted of violating Section 491, Title 7, U.S.C.A. and appeal.

David Schiller had, for a considerable time prior to July, 1951, been selling eggs in Florida for Richard Swalve, doing business with his brother as the Swalve Produce Co., located at George, Iowa. In the latter part of July, 1951, Schiller and the defendant Gross went to George, Iowa, and made an oral agreement with Swalve, by which agreement Swalve was to ship eggs to Florida to Gross and a corporation to be formed by Gross. The corporation was created under the name of the defendant, Quality Egg Shippers, Inc. Gross was its president. The nature of that agreement is the crucial question in this case. A large number of cases of eggs were shipped to Quality Egg Shippers, Inc., at Miami, Florida, between the early part of August, 1951, and March, 1952. Swalve received payment for all eggs shipped except the last two truckloads, which were shipped February 22 and March 1, 1952. The defendants were indicted and convicted for knowingly, and with intent to defraud, failing to account to Swalve for these two truck loads. The pertinent portion of Section 491, Title 7, U.S.C.A., upon which the indictment was based is as follows:

"* * * any person, firm, association, or corporation receiving any * * * poultry products or any perishable farm products of any kind or character, * * * in interstate commerce, * * * for or on behalf of another, who without good and sufficient cause therefor, * * * shall knowingly and with intent to defraud fail truly and correctly to account therefor shall be guilty of a misdemeanor * * *."

The defense was that the Quality Egg Shippers, Inc., was the purchaser of the eggs and not the agent of Swalve. If it was a purchaser, the statute does not apply. If it was an agent, the statute does apply. The trial court submitted

the question of agency or purchaser to the jury. The jury found Quality Egg Shippers was the agent and convicted. Defendants contend that the evidence was undisputed on that issue and presented only a question of law which the court should have determined in their favor and directed a verdict of acquittal. In that manner the crucial question arises.

If the evidence was undisputed and established a clear and unambiguous agreement concerning the relationship the parties bore to each other, its legal construction was a question of law. But if the language used and the facts and circumstances surrounding the transaction were such that conflicting inferences could reasonably be drawn as to the intent of the parties, a question of fact arose for the jury's determination.

▉ From several circumstances and some conclusions stated by Swalve, an inference could have been drawn that the eggs were sold to the defendant corporation. But if Swalve's testimony was believed, as it evidently was, the jury was justified in concluding that the corporate defendant and Gross were the agents of the shipper Swalve. Mr. Swalve's testimony is to the effect that the corporation and Gross were to obtain customers for the purchase of the eggs in Florida. As those customers were obtained Gross called Swalve and informed him the quantity and quality of eggs to be shipped. As soon as Swalve obtained the desired quantity it was shipped. The amount to be remitted by defendants was to be the top quotation on the New York market the day of arrival of the eggs at Miami, less 3½ cents per dozen, 3 cents of which was allowed for freight and ½ cent for commission. If cheaper transportation could be obtained, defendants were to get the benefit of the difference. The definite amount to be remitted, based on the New York market, was for the purpose of enabling the shipper to know how much he was to receive. It also made it possible for the defendants to sell in advance at whatever the New York price

would be on the date of arrival in Florida, to sell at a price fixed in advance of arrival, or to order a larger amount than had actually been sold and hold a portion of a shipment on the prospect of selling it at a price greater than the New York price on the date of arrival. This arrangement gave defendants the opportunity to treat a portion of a shipment as if it was purchased by defendants, to remit to Swalve upon the price formula agreed upon, and speculate on getting more upon resale than the agreed commission. This appears to have been done on some occasions. But the possibility, under the arrangement made, for the defendant corporation in effect to purchase from itself and speculate on obtaining a profit greater than its commission did not necessarily make the arrangement primarily one of purchase and sale. The evidence shows that ordinarily the truckloads were delivered to predetermined customers from the truck to the customers' places of business upon arrival in Florida. Occasionally a part of a truckload was placed in defendants' cooler and sold later. But there was no fixed arbitrary time within which remittances had to be made. This again afforded an opportunity to defendants to speculate on being able to obtain more, before a reasonable time for remittance had elapsed, than the stipulated commission, without the necessity of maintaining the capital necessary to remit for all of the shipments upon arrival. But it does not appear that Swalve knew of any such practice or was concerned about whether defendants took the risk of speculation. He testified that his concern was only in receiving the New York price less the 3½ cents. It further appears that the volume of sales had declined in February, 1952, to such an extent that Swalve went to Miami to see what was wrong. He was told by Gross that competition was rather keen and a larger commission should be allowed. Swalve agreed to increasing the commission to ¾ of a cent per dozen. The two loads now involved were shipped under that commission rate. Swalve tes-

tified that it was agreed that when defendants obtained regular customers to whom shipments were made direct, a commission of ½ cent per dozen was to be paid defendants. Schiller had one such customer before the arrangement with the corporation and Gross was made. That customer was specifically mentioned at the time of the original agreement. Defendants contended that the reason for not remitting for the two loads in question was because Swalve owed them for commission on eggs shipped direct to many customers in Florida. In an effort to obtain payment for the two loads, Swalve agreed to pay commission on direct shipments he said he did not owe defendants, but that Gross flatly refused to pay for the eggs received unless Swalve would execute a written contract under which defendants would be the exclusive outlet of Swalve's eggs in Florida and receive a commission on all eggs shipped into the State of Florida by Swalve. This Swalve would not agree to. The weight of the evidence of the witnesses was, of course, for the jury. But the very fact that defendants were claiming commission on shipments to customers, which did not pass through defendants' hands, and that the parties agreed that there was for a time one such customer, were facts which the jury could consider in determining whether the arrangement was one of agency or of direct sale to defendants. Whether the defendants' failure to remit was for the reason asserted by them or whether the failure to remit was for the purpose of compelling Swalve to execute a new contract was a question of fact to be determined by the jury. And the question of whether the agreement relating to the regular customers was, as contended by defendants, a separate and distinct contract from the agreement concerning eggs which were to be shipped direct to defendants or was merely an incident to the general agency contract between defendants and Swalve, rested upon the weight to be given the testimony of the witnesses. The question of whether defendants were agents or purchasers was also one of fact for the jury. The jury resolved these questions by finding that defendants were agents. The evidence adequately supported that finding. The judgments should therefore be and are affirmed.

GARDNER, Chief Judge (dissenting).

I find myself in disagreement with the majority opinion. This is a criminal case and the evidence to be substantial must be sufficient to prove the guilt of the accused beyond a reasonable doubt. The statute involved is penal and must be strictly construed. Federal Communications Commission v. American Broadcasting Company, 1954, 74 S.Ct. 593.

I agree with the majority opinion that the nature of the contract between the defendants and Swalve is the crucial question in this case. The guilt or innocence of the defendants may be said to depend upon the interpretation or nature of the contract between private individuals. The contract was an oral one. The parties thereto do not entirely agree as to what was said in the conversations out of which the contract grew. The government contends that the egg shipments involved were received by defendants for and on behalf of the prosecuting witness and confessedly they were transported in interstate commerce. It is true that Swalve in his testimony testified that defendants were "to handle these eggs for me." There is, however, no magic in these words. The contract being oral and the parties thereto being in disagreement as to its proper scope and interpretation, the surrounding facts and circumstances under which it was made and the surrounding acts of the parties indicating their understanding of its terms are pertinent facts for consideration. Thomson v. Thomson, 8 Cir., 156 F.2d 581; Terry v. Muller, 8 Cir., 190 F.2d 170; Craig v. Thompson, 8 Cir., 177 F.2d 457.

In this connection attention is called to the testimony of O. N. Harsha, a Marketing Specialist employed by the United States Department of Agricul-

ture in Washington. In the course of his testimony he said:

"In the egg produce trade, the words 'commission man' or 'commission merchant' have a very definite meaning. This man or merchant receives eggs and he sells the eggs for what he can get for them. He receives the particular shipment of eggs from a consignor. He sells the shipment for as much money as he can if he is a good commission merchant, and he deducts therefrom his fee. It is a cent or two cents, depending upon the locality, and his ability to make quick sales, and if the transportation charges are paid at destination, those charges are paid by the Commission merchant out of his deduction for handling, and the net sum that is left is remitted to the consignor."

Manifestly, according to the accepted usages in the egg trade, as explained by this expert witness, and his testimony stands without dispute, the defendants were not commission men nor brokers. The witness further testified as follows:

"When eggs are handled by a commission man or broker for a shipper, it is not customary for the shipper to be guaranteed a price. The term 'dealer' has a particular meaning in the egg trade. A dealer is a man who buys eggs and then sells those eggs in anticipation of a profit. Sometimes his anticipations are not realized. He may sustain a loss, but they are his eggs to do with as he pleases. He buys the eggs at a set price, and he sells them for what he can get. The price paid to the original shipper who ships the eggs to the dealer does not depend on what the dealer is able to get for them. There is a definite price between the dealer and the shipper. The custom for determining the price is the same in the egg business as every other business. The man buys it at a set price. They agree to the terms. The seller says, 'I will sell you these eggs at so much a dozen,

so much a case.' 'All right, I will buy them.' That is the end of it.

\*    \*    \*    \*    \*    \*

"When eggs are handled by a commission man it is not the custom of the trade for the buyer and seller to have a specific price in mind ahead of time."

It is equally clear from the acts of the parties that the defendants were dealers. They paid a fixed price definitely determined. They paid this on delivery of the eggs and they paid it whether they sold the eggs or retained the eggs, and they paid it whether their ultimate sales were at a profit or at a loss. In other words, their sales were on their own account and not on the account of the prosecuting witness. The contract as actually performed by the parties had none of the usual attributes of an agency existing between a commission man and his principal. Title vested in the defendants and they were free to do as they chose with the product. The prosecuting witness in his testimony with reference to his attempt to break the contract with the defendants, among other things said, "I broke off business with them on March first, the last load I *sold* to them." (Italics supplied.) When the eggs were received by the defendants they became primarily liable for a definite purchase price. The local law determines the nature of the contract here involved. In re Heckathorn, 3 Cir., 144 F. 499; In re Morris, 3 Cir., 156 F. 597. Under the decisions of the Supreme Court of Iowa the contract as performed by the parties constituted an absolute sale. Norwegian Plow Co. v. Clark, 102 Iowa 31, 70 N.W. 808; Norton v. Fisher, 113 Iowa 595, 85 N.W. 801; Hull-Dobbs Motor Co. v. Associates Discount Corp., 241 Iowa 1365, 44 N.W.2d 403; Alpha Check-Rower Co. v. Bradley, 105 Iowa 537, 75 N.W. 369.

Referring now to the rule often announced by this and other courts that where the contract is oral and there is dispute as to its terms the contemporaneous acts of the parties before any controversy arose with reference to the in-

terpretation of the contract is very significant. In Terry v. Muller, supra [190 F.2d 172], we said:

"It is elementary that the cardinal rule in the construction of contracts is to determine the intent of the parties. Where the contract is in writing this must usually be determined by the words of the contract. Here there was no written contract and it must be determined to a large extent by the surrounding circumstances, the acts of the parties and how the parties themselves construed or interpreted it. There was no claim of fraud or misrepresentation of any kind.

\* \* \* \* \* \*

" \* \* \* The action of the parties during the time of the performance of this contract indicated what they thought of its scope and meaning and their conduct is of great, if not controlling, influence in ascertaining their understanding of the scope and terms of the contract. It may generally be assumed, in the absence of fraud or misrepresentation, that parties to a contract know best what was meant by its terms and they are the least likely to be mistaken as to its intention, and whatever is done by the parties during the period of performance of the contract is presumed to be done under the terms of the contract as they understood and intended it to be."

In Craig v. Thompson, supra [177 F. 2d 460], we stated the rule as follows:

"It has long been the law that 'Where the parties proceed in the performance of the contract as though it had a certain meaning and that meaning is not entirely inconsistent with the wording of the contract, it should prevail.' "

The statute, I think, was not intended to cover the situation shown in this case and being penal in nature it ought to be strictly construed. There was not substantial evidence sufficient to prove the guilt of the defendants beyond a reasonable doubt. At best, most liberally construed the evidence did not exceed the dignity of a scintilla and hence, the court should have sustained the defendant's motion for acquittal. Even had the case been a civil action to recover, not the purchase price of the eggs but damages for the alleged breach of contract, the evidence would not have been sufficient to sustain a verdict for plaintiff. The case in fact has some of the earmarks of a criminal proceeding brought to recover a debt rather than for the enforcement of a law enacted for the protection of the public. I would reverse.